Filed 4/26/16  P. v. Diaz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE ROMERO DIAZ,<br><br>    Defendant and Appellant. | H040282<br>(Santa Clara County<br>Super. Ct. No. C1224743) |

Defendant Jose Romero Diaz appeals a judgment entered following a jury trial during which he was convicted of attempted murder (Pen. Code §§ 664, subd. (a), 187).[1] On appeal, defendant asserts that the trial court erred in instructing the jury with CALCRIM No. 252, and allowing the testimony of a gang expert.  In addition, defendant argues that he was denied effective assistance of counsel, and that the prosecutor committed misconduct during his trial.

### STATEMENT OF THE FACTS AND CASE

About 8:30 p.m. on December 29, 2010, Kyle Ortiz was walking in the area of Mclaughlin Avenue and Fair Avenue, in San Jose.  Ortiz was with his girlfriend, Maria Valtierra, and a friend named Yessenia Muñoz, as well as a young girl named Brianna.

---

[1] All further statutory references are to the Penal Code.

Ortiz testified that he had "hung around" with Norteño gang members in the past, and knew that the part of town he was walking in was claimed by the Sureños.

As the group walked along Mclaughlin Avenue, a car drove up very quickly and someone in the car yelled out "Sur Trece" several times. Two or three people got out of the car, while a fourth person remained in the car. Muñoz testified that one of the men "asked Kyle what we were doing walking down the street and why we were there." One of the men who got out of the car took out a knife and stabbed Ortiz twice in the neck and twice on his side. The stabber ran back to the car, shouting "It's my hood. Stay out. Sur Trece." The stabber and the other men got back in the car and drove away.

Ortiz told police that the stabber was wearing a black beanie and was pulled down low, with his eyebrows still visible. Ortiz identified defendant as the stabber in court at trial, and at the preliminary hearing.

On the night of the attack, police showed Muñoz a six-pack photo array, and she said that the photo of defendant "looked familiar." On January 11, 2011, police showed Muñoz a second six-pack array with different suspects depicted in the photographs; defendant was the only suspect that was repeated in the second array. Muñoz again picked defendant's picture, saying that it "kinda look[s] like him. . . He's the guy that stabbed my friend. . . His eyebrows, his mustache, his facial structure."

When police arrived at the scene, they found a red LG Metro PCS cell phone in the gutter along the curb in the area of the attack. Ortiz said that he saw defendant drop the phone during the attack. Muñoz said that she saw a phone drop as the men got out of the car. She said the person who attacked Ortiz dropped the phone. Valtierra said that she did not actually see the stabber drop the phone, but that he was the only person in that area where the phone was on the ground.

The police searched the phone, and inside they found photos of defendant, along with videos of defendant with a woman and children.

Officer Ken Tran questioned defendant on January 5, 2011. Defendant said that he had lost his cell phone two or three days before. He denied having been in the area where the stabbing happened. During the interview, defendant told Officer Tran "[i]f you want me to take the charge, I'll take the charge."

Detective Kenneth Rak questioned defendant on February 15, 2012 Defendant said that he did not know why his phone was found in the area of the stabbing, and that he had not been there before. He did not know how he had lost the phone. Defendant admitted that he "claimed" Sureño.

Defendant was arrested in February of 2012, and was carrying a cell phone and a knife at the time. Some of photos on the cell phone that defendant was carrying when he was arrested were the same as the photos from the Red LG phone that was found at the scene of the stabbing. The photos found in the phone included one picture of a gang hand sign signifying an "E," referring to the East Side of San Jose.

Defendant had previously admitted belonging to Varrio Tami Lee, a Sureño subset based in San Jose. He has a "1" and a "3" tattooed on his arms in reference to the number "13," signifying Sureño affiliation.

Detective Rak testified that the Sureños are a criminal street gang with the primary activities of homicide, assault with a deadly weapon, drive-by shootings, and felony vandalism. He described the following predicate offenses: (1) an incident that occurred on in September 2009 during which defendant and other Sureños committed battery for the benefit of a criminal street gang; (2) an incident that occurred in July 2009 during which Vario Tami Lee Sureños committed assault with force likely to cause great bodily injury and assault with a deadly weapon; and (3) an incident that occurred in May 2010 during which Sureños committed assault with a deadly weapon and felony vandalism.

3

Detective Rak testified that he believed that the crime committed in this case would benefit the Sureños by helping to control the territory and would intimidate other rival gangs.

On May 7, 2013, defendant was charged by information with one count of attempted murder (§§ 187, 664, subd. (a)), with the additional allegations that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)) and that defendant personally inflicted great bodily injury on a person other than an accomplice in the commission of the offense (§§ 12207, subd. (a) & 1203, subd. (e)(3)).

Defendant was convicted after jury trial of all charges, and the jury found that enhancements to be true. The court sentenced defendant to 20 years in prison, and defendant filed this appeal.

DISCUSSION

Defendant argues that the trial court erred by instructing the jury with CALCRIM No. 252 and allowing the gang expert to testify based on hearsay evidence. In addition, defendant asserts that he was denied effective assistance of counsel because his attorney did not object to identification procedures that were unduly suggestive. Finally, defendant argues that the prosecutor committed misconduct in closing argument.

## CALCRIM No. 252

Defendant asserts that the trial court erred in instructing the jury with CALCRIM No. 252, because the instruction as given did not specify the intent required for a finding of guilt on the attempted murder charge. Specifically, defendant argues that the instruction permitted the jury to convict defendant based on a finding that he had "wrongful intent" rather than an intent to kill.

Defendant's counsel did not object to the instruction as given, nor did he ask that the instruction be modified or clarified. Defendant argues that no objection was required below because his "substantial rights" were affected. Specifically, defendant argues the

4

error in instructing the jury with CALCRIM No. 252 violated his due process rights under the Fourteenth Amendment and his right to a jury trial under the Sixth Amendment.**2**

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) However, we may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby" (§ 1259.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

Our Supreme Court has explained: " '[w]hen we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions given as a whole and not in isolation. [Citation.]' " (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.) Generally, we ask whether there is any reasonable likelihood the jury was confused and misapplied the instructions. (*People v. Harrison* (2005) 35 Cal.4th 208, 252 (*Harrison*).)

" ' "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People v.*] *Watson* (1956) 46 Cal.2d 818 (*Watson*)].' [Citations.] '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

---

**2** Defendant filed a supplemental opening brief adding the argument regarding the Sixth Amendment to his original arguments in his opening brief.

Here, the jury instruction on the union of act and intent, CALCRIM No. 252, was given and stated the following: "The crime and other allegations charged in Count One require proof of the union, or joint operation, of act and wrongful intent. [¶] The following allegation requires general criminal intent: infliction of great bodily injury. For you to find the allegation true, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that allegation. [¶] The following crime and allegation require a specific intent or mental state: attempted murder and the gang enhancement. For you to find a person guilty of this crime or to find the allegation true, that person must not only intentionally commit the prohibited act, but must do so with a specific intent. The act and the specific intent/ required [*sic*] are explained in the instruction for that crime or allegation."

The instruction on attempted murder, CALCRIM No. 600 stated that to find appellant guilty of attempted murder the jury must find that appellant took a direct but ineffective step toward killing another person and "intended to kill [the] person." In addition, the court instructed the jury with CALCRIM No. 200, telling the jurors to consider the instructions as a whole.

Initially, we note that CALCRIM No. 252 is a correct statement of the law (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1189-1190.) Moreover, when CALCRIM No. 600, which requires a finding of specific intent to kill, is read in conjunction with CALCRIM No. 252, which requires a finding of a union of act and "wrongful intent," a reasonable juror would understand that the "wrongful intent" required is that specified for attempted murder; namely, the specific intent to kill.

6

When considered as a whole, the instructions as given in this case were accurate reflections of the law, and we find that there is not a reasonable likelihood that the jury was confused or misapplied the instructions. (*Harrison*, *supra*, 35 Cal.4th at p. 252).

*Photo Identifications*

Defendant asserts that his trial counsel was prejudicially ineffective in failing to move to suppress Yessenia Munoz's identification testimony, which he argues was the result of her exposure to suggestive identification procedures.

A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The first element "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland, supra*, at p. 687.) "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Ibid.*) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) A court deciding an ineffective assistance claim does not need to address the elements in order, or even to address both elements if the defendant makes an insufficient showing on one. (*Id.* at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Ibid.*)

In order to establish that defendant's trial counsel was deficient in failing to move to suppress the identification in this case, defendant must first establish that the identification was improperly suggestive. An identification procedure is unfair if it "suggests in advance of identification by the witness the identity of the person suspected by the police." (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891.) Admission of

7

eyewitness identification evidence may violate a defendant's constitutional due process rights if the identification procedures were "unnecessarily suggestive and conducive to irreparable mistaken identification . . . ." (*Stovall v. Denno* (1967) 388 U.S. 293, 302.)

On the issue of the fairness of an identification, the California Supreme Court stated: "[T]o determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was *unduly suggestive* and unnecessary, and, if so, (2) whether the identification itself was nevertheless *reliable under the totality of the circumstances,* taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 (*Cunningham*), italics added.)[3]

In determining whether an identification procedure is unduly suggestive, "[t]he question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him [or her]." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367.) "The defendant bears the burden of demonstrating the existence of an unreliable identification procedure." (*Cunningham, supra,* 25 Cal.4th at p. 989.) The question of whether an identification procedure is "unduly suggestive" for due process purposes is a mixed question of law and fact that we review de novo, or independently of the trial court's ruling. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608-609.)

The identification at issue in this case was the result of Muñoz being presented with two photo arrays. On December 29, 2010, the police showed Muñoz the first array

---

[3] Defendant did not address the issue of whether identification procedures are unduly prejudicial under the totality of circumstances test in his opening brief. Defendant later raise this issue in a supplemental brief.

8

of six photographs. Muñoz identified defendant and wrote: "The person in Number 2 looks familiar. He looks like the suspect who was wearing a beanie." On January 11, 2011, the police showed Muñoz a second set of six photographs. In this array, the police replaced all of the people represented in the first array with different suspects, except defendant, who was repeated in the second array. However, the photograph of defendant in the second array was different that the one presented to Muñoz in the first array. In viewing the second array, Muñoz identified defendant in position number one by writing: "That kind of looks like him. He's the guy that stabbed my friend."

During trial, the prosecutor asked Muñoz if she had identified defendant in the two photo arrays, and she said that she had. She also identified defendant in court as the person who stabbed Ortiz. Defendant argues that his trial counsel should have objected to Muñoz's independent identification of him in court, because her testimony was tainted by suggestive identification procedures used by police prior to trial. Specifically, when the police presented Muñoz with the second array of photographs, the only suspect who appeared again was defendant; all other suspects had been replaced. As a result, Muñoz saw defendant two times, while she saw the other suspects only once.

Defendant relies on *Foster v. California* (1969) 394 U.S. 440, 442-443 (*Foster*), for the proposition that changing every person in a lineup except for defendant so that defendant was the only person in the second lineup who appeared in the first lineup violates due process. However, contrary to defendant's argument, *Foster* does not provide support for his case, because there are very important factual distinctions. Specifically, in *Foster*, the two lineups were in person. (*Id*. at p. 443.) In the first lineup, the defendant stood out from all of the other suspects because he was five to six inches taller than they, and he was wearing a leather jacket that was similar to what the witness had seen the robber wear. (*Ibid*.) Prior to the second lineup, the police allowed the

9

witness to personally confront the defendant one-on-one. (*Ibid*.) When the defendant was repeated in the second lineup, the witness was certain defendant was the person who committed the robbery. (*Ibid*.)

The similarity between *Foster* and this case begins and ends with the repetition of defendant in the second lineup. Here, the police did not suggest that defendant was the stabber by presenting Muñoz with photographs of suspects who were significantly dissimilar to defendant in appearance, or allowing Muñoz to see defendant separate and apart from any other suspects. *Foster* does not support a finding that the identification procedures in this case were improperly suggestive.

Defendant cannot establish that his counsel was deficient for failing to object to Muñoz's identification of defendant as the stabber, because defendant cannot establish that the identification procedures used in this case were improperly suggestive under the totality of the circumstances. The fact that defendant was the only suspect repeated in the second photo lineup does not itself demonstrate that the procedures were suggestive. Other than to assert that the repetition of defendant in the second lineup was improper, defendant offers no other reason that the identification procedure in this case was suggestive.

### Gang Expert Testimony

Defendant asserts that he was denied his constitutional right to confrontation because the prosecution's gang expert was allowed to testify to his opinion based on hearsay statements.

Prior to trial, defense counsel brought an in limine motion arguing that allowing Detective Rak to rely on hearsay evidence in offering his expert opinion on gang affiliation would violate defendant's Sixth Amendment right to confrontation. In denying the motion, the court stated: "[W]hile potentially testimonial, [the hearsay statements] are not being offered for the truth of the statement, but rather as a basis for the expert's

10

opinion only." Defense counsel stated that it intended to raise an ongoing objection to the admission of the expert's opinion that was based on hearsay as violating defendant's Sixth and Fourteenth Amendment rights.

At trial, Detective Rak was qualified as an expert in criminal street gangs based upon his assignment with the Gang Investigations Unit of the San Jose Police Department for over two years, his participation in formal and informal trainings and his review of e-mails and newsletters from the California Gang Investigators Association. Detective Rak stated that he had spoken to gang members and had participated in the registration of more than 100 gang members with the San Jose Police. Detective Rak described the Sureño street gang as "one of the top two criminal street gangs within Santa Clara County."

Detective Rak testified that Sureños have common signs and symbols, they perpetrate "homicides, assault with deadly weapons, drive-by shootings, felony vandalisms, [and] robberies"; and they engage in a "pattern of criminal gang activity." Detective Rak also testified to three predicate offenses committed by Sureños, including one committed by defendant.

An expert may offer an opinion if the subject is sufficiently beyond common experience and the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) In general, the testimony of a gang expert meets this test. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) Beyond the foregoing, expert opinion must be "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates[.]" (Evid.Code, § 801, subd. (b).) Under the Evidence Code, an expert may rely on hearsay such as conversations with gang members and information gained from law enforcement

11

colleagues and agencies. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 (*Gardeley*). Nevertheless, currently, the ability of an expert to rely on hearsay without implicating the confrontation clause concerns is in a state of flux.

In *Gardeley, supra*, 14 Cal.4th 605, the California Supreme Court explained that expert testimony may be "premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" and "even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony"; and "because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Id*. at p. 618.) *Gardeley* concluded that a gang expert, in opining that an assault in which the defendant participated was gang related, properly relied on and revealed an otherwise inadmissible hearsay statement by one of the defendant's alleged cohorts that he, the alleged cohort, was a gang member. (*Id*. at pp. 611-613, 618-619.) In reaching this conclusion, *Gardeley* reasoned that it was proper for the expert to reveal the alleged cohort's hearsay statement, because the hearsay evidence or statement was not offered for its truth and was properly allowed under Evidence Code section 802. (*Gardeley, supra*, at pp. 618-619.) Nevertheless, subsequent developments in the law require us to examine the continuing precedential value of *Gardeley* as it relates to this confrontation clause issue.

In *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221] (Williams), "the prosecution called an expert who testified that a DNA profile produced by an outside laboratory . . . matched a profile produced by the state police lab using a sample of the [defendant's] blood." (*Id*. at p. __ [132 S.Ct. at p. 2227] (plur. opn. of Alito, J.).) In the plurality opinion, Justice Alito stated that "[o]ut-of-court statements that are related by

12

the expert solely for the purpose of explaining the assumptions on which [an] opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Id*. at p. __ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).)  However, four members of the court denounced the "not for the truth" rationale, in dissent, as "a prosecutorial dodge." (*Id.* at p. ___ [132 S.Ct. at p. 2265 (dis. opn. of Kagan, J.).) They quoted at length from a treatise describing that rationale as " 'very weak,' 'factually implausible,' 'nonsense,' and 'sheer fiction.' " (*Id*. at p. 2269., quoting D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence § 4.10.1, pp. 196-197 (2d ed.2011); id., § 4.11.6, at 24 (Supp.2012).)  A fifth member of the court substantially agreed with this characterization, citing the same text, but joined with the other four members of the court to form a plurality on the ground that the laboratory report there at issue did not satisfy his unique test for what constitutes a " ' "testimonial" ' " statement triggering a right to confrontation. (*Williams, supra*, ___ U.S. at pp. ___, ___ [132 S.Ct. at pp. 2255, 2257] (conc. opn. of Thomas, J.).)

After *Williams*, the California Supreme Court analyzed confrontation clause issues in *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) and *People v. Rutterschmidt* (2012) 55 Cal.4th 650 (*Rutterschmidt*).  All three cases involved witnesses who testified about technical reports that they did not prepare. (*Lopez, supra*, at p. 573 [a laboratory analyst testified regarding a blood-alcohol level report prepared by a colleague]; *Dungo, supra*, at p. 612 [a pathologist testified regarding the condition of the victim's body as recorded in an autopsy report prepared by another pathologist]; *Rutterschmidt, supra*, at p. 659 [a laboratory director testified that his analysts had detected the presence of alcohol and sedatives in the victim's blood].)  In *Lopez*, the court found no confrontation clause violation because the critical portions of the report regarding the defendant's blood-alcohol level were not made with "the requisite degree of formality or solemnity to be considered testimonial." (*Lopez, supra*,

13

at p. 582.) The *Dungo* court declined to find a confrontation clause violation because the "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body; it was only one of several purposes. . . . The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial." (*Dungo, supra*, at p. 621.) The confrontation clause issue in *Rutterschmidt* was not reached because the court concluded that the evidence of guilt was overwhelming and any error was harmless beyond a reasonable doubt. (*Rutterschmidt, supra*, at p. 661.)

In *Lopez*, our Supreme Court looked at the fractured *Williams* opinion and explained that "all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Lopez, supra*, 55 Cal.4th at p. 582.) However, this rule sheds very little light on whether a gang expert can provide an opinion that is based on hundreds of different pieces of information, especially given the reality that gang experts often rely on a mixture of knowledge gained through personal observations and investigations, nontestimonial hearsay, and testimonial hearsay. In other words, a gang expert's opinion is likely based at least in part on matter that raises no confrontation clause concerns. Moreover, practically speaking there is a distinction between a scientific or medical expert relying on a report versus a gang expert relying on multiple sources.

The California Supreme Court is currently considering whether the Sixth Amendment right to confrontation bars a gang expert's reliance on testimonial hearsay. (*People v. Sanchez* (2013) 223 Cal.App.4th 1, review granted May 14, 2014, S216681; see also *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640 [briefing deferred pending consideration and disposition of *Sanchez*].) However, until the California Supreme Court holds otherwise, we are bound to follow *Gardeley* by *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and

14

therefore reject defendant's confrontation clause challenge to Detective Rak's expert testimony.

In the present case, there was overwhelming evidence to support a finding that defendant committed the crime for the benefit of a criminal street gang. In particular, defendant told Officer Tran that he would "take the charge," and admitted to Detective Rak that he "claimed" Sureño. He yelled out "sur trece" while he stabbed Ortiz. Defendant's phone that was found at the scene contained photographs of defendant displaying gang signs, and he had tattoos representing Sureño affiliation. The admission of the expert testimony in this case was harmless under either standard. (*Watson, supra*, 46 Cal.2d 818; *Chapman v. California* (1967) 386 U.S. 18.)

### Prosecutorial Misconduct

Defendant argues that the prosecutor committed prejudicial misconduct by using epithets in closing argument that were intended to inflame the passion of the jury.

"Prosecutorial misconduct implies a deceptive or reprehensible method of persuading the court or jury." (*People v. Price* (1991) 1 Cal.4th 324, 448, superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.) Although prosecutors are given " ' " 'wide latitude' " ' " in arguing their cases, they nevertheless "are held to an elevated standard of conduct." (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*), overruled on other grounds in Price v. Superior Court (2001 25 Cal.4th 1046, 1069, fn. 13.) The imposition of this higher standard is justified by their "unique function . . . in representing the interests, and in exercising the sovereign power, of the state." (*Id*. at p. 820.)

To warrant reversal, the challenged conduct must be prejudicial. "What is crucial to a claim of prosecutorial misconduct is . . . the potential injury to the defendant." (*People v. Benson* (1990) 52 Cal.3d 754, 793.) When the claim "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable

15

likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 841.) To answer that question, we examine the prosecutor's statement in the context of the whole record, including arguments and instructions. (*Hill, supra*, 17 Cal.4th at p. 832.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

As a matter of federal constitutional law, a prosecutor's behavior constitutes prejudicial misconduct when it is " ' " ' "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*Hill, supra,* 17 Cal.4th at p. 819.)

Here, defendant asserts that the prosecutor's use of epithets in describing him during closing argument was improper. Specifically, the prosecutor commented during closing argument as follows: "He's done a good job as a lawyer for his client. Unfortunately, his client is a vicious, violent gangster, who is stupid enough, careless enough to leave his identification basically, his cell phone at the scene, after he tried to murder this guy." The prosecutor further described defendant, as follows: "This is a stone-cold gangster, vicious attempted murderer. He didn't care about his interview with the police." Finally, the prosecutor asked the jury if it wanted to "bend over backwards to help this vicious thug out." At this point in the argument, defense counsel objected as follows: "Objection. This is the fourth time [the prosecutor] called my client names," to which the court stated: "Overruled. It's argument."

16

The prosecutor's statements in his closing argument were not improper in this case. " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' [Citation]" (*People v. Tully* (2012) 54 Cal.4th 952, 1021.) The evidence presented during the trial warranted the epithets the prosecutor used. Specifically, defendant admitted that he was a Sureño gang member. While he stabbed the victim who he perceived to be a Norteño four times, he yelled "Sur Trece." To describe defendant as a "vicious, violent gangster," "stone-cold gangster," "vicious attempted murderer," and a "vicious thug," is supported by the evidence. The prosecutor's comments to describe defendant did not improperly appeal to the sympathy or passion of the jury. (See, e.g., *People v. Fields* (1983) 35 Cal.3d 329, 362-363.)

## *Cumulative Error*

Defendant argues that the cumulative effect of the alleged errors in this case deprived of him of his constitutional right to a fair trial, and therefore the conviction must be reversed. The California Supreme Court has instructed that "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*Hill, supra*, 17 Cal.4th at p. 844.)

In the present case, we have determined that none of the above claimed actions on the part of the court were prejudicial errors. Moreover, the cumulative effect of the claimed errors is insufficient to rise to the level of reversible and prejudicial error. Therefore, we must reject defendant's contention of cumulative error.

### DISPOSITION

The judgment is affirmed.

17

_____

RUSHING, P.J.


WE CONCUR:


_____

PREMO, J.


_____

ELIA, J.


*People v. Diaz*
**H040282**